Miguel **TORRES**, Plaintiff–Appellant/Cross–Appellee,

v.

Michael R. **WHITE**, et al., Defendants–Appellees/Cross–Appellants.

Nos. 00–4146, 00–4338.

United States Court of Appeals, Sixth Circuit.

Aug. 22, 2002.

Before DAUGHTREY and CLAY, Circuit Judges; and WILLIAMS, District Judge.*

CLAY, Circuit Judge.

Plaintiff Miguel Torres appeals, and Defendants Michael R. White, et al. cross-appeal, from the judgment entered on a jury verdict in this nine-count action brought by Plaintiff against the City of Cleveland, his former employer, and the individual Defendants, who were employed by the City, arising from Plaintiff's discharge from his position as Manager of Human Resources Monitoring and Evaluation in the Human Resources Division of the City's Department of Personnel. The jury returned a verdict against the City on three of the nine claims in Plaintiff's complaint, awarding him damages in the amount of $80,500. In a post-judgment opinion and order, the district court denied the parties' post-judgment motions. For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

## BACKGROUND

Plaintiff, a citizen of the United States and a native of Puerto Rico, was hired by

---

\* Honorable Glen M. Williams, United States District Judge for the Western District of Virginia, sitting by designation.

Defendant City of Cleveland ("the City") as a student intern in 1988, and eventually became one of seven managers, and the only Hispanic manager, of the Human Resources Division of the City's Department of Personnel in 1992. In 1997, Plaintiff also became the Project Manager/Administrator of the City's Empowerment Zone One–Stop Career Center ("the Center"), administering both the Job Training Partnership Act (JTPA) and Empowerment Zone (EZ) federal job programs. Plaintiff held the position of Manager of Human Resources Monitoring and Evaluation in the Human Resources Division of the City's Department of Personnel until December 4, 1998, when he was suspended. Prior to his suspension, Plaintiff was regarded by his immediate supervisor, Defendant Joseph Nolan, then the Director of the Department of Personnel, as one of the "City's better managers." (J.A. at 140–45.) According to Plaintiff, he had never been disciplined, and was recognized as an exceptional manager during this period.

Plaintiff's suspension was prompted by an investigation into contracts issued by the Center administered by Plaintiff. In October or November of 1997, Plaintiff was on a committee that recommended an $18,000 training contract for RCR, Inc., which was issued on December 26, 1997 pursuant to the Mayor's emergency procurement. The president of RCR, Inc. ("RCR") was Plaintiff's brother-in-law, Ray Rivera. After the contract was approved, Personnel Director Nolan reviewed it before the contract went to the accounts division and the law department for certification. The committee also received a proposal from MBM Trucking ("MBM") to teach commercially licensed truck drivers to haul steel, proposing 125 hours of training for eligible participants, i.e., truck drivers with commercial driver's licenses living within a federal empowerment zone. Upon approval of the contract,

MBM submitted an invoice for $81,000, the total amount of the contract. The invoice submitted by MBM was sent to Jose Vazquez in the fiscal section for processing, and was eventually approved for payment by the invoice verification specialist on June 12, 1998. Upon approval, Plaintiff reviewed the request for $81,000 and questioned Vazquez about approving the request for the full amount of the contract. As a result, Plaintiff gave his approval for only $45,000, and a voucher for that amount was issued on June 16, 1998 after being authorized by Director Nolan. Thereafter, payment on the full amount of the invoice was made after it was approved by Director Nolan and Accounts Commissioner Goodwin, who were the only officials authorized by law to approve the payment.

Subsequently, on October 30, 1998, the City received a public record request from a local television station for information about the MBM contract that was administered through the City's EZ program. As a result, the City began an internal review of the MBM contract and documents, which Plaintiff provided at Nolan's request. At a meeting on November 18, 1998, Nolan questioned Plaintiff about the payment to MBM. Plaintiff stated that because the paperwork was in order, he signed off on the payment of the invoice. Plaintiff also explained that the invoice was reviewed and approved for payment by the Human Resources Fiscal Section before it was sent to Nolan for his approval, reviewed by Commissioner Goodwin and paid by the Treasurer's Office.

A second public record request was made by the same television station on November 17, 1998 concerning records and documents about the RCR contract. At a meeting on November 20, 1998, Plaintiff conveyed the documents pertaining to this contract to Nolan. Thereafter, on November 23, 1998, Plaintiff had a meeting with

Nolan and the Mayor's chief of staff concerning questions about the RCR contract. At this meeting, Plaintiff offered to resign his position and then rescinded his resignation. It was sometime after this meeting, however, that Plaintiff acknowledged during a conversation with Nolan that Rivera, the president of RCR, was his brother-in-law.

At about the same time, the City's legal department, in the course of reviewing the documents relating to the MBM contract, detected certain "irregularities" and informed the Mayor's staff and Defendant Barry Withers, an executive assistant to then Mayor, Defendant Michael White. (J.A. at 182.) It was determined that although a one-year contract was typically paid on a monthly or bi-monthly basis, the MBM contract was paid in two payments within three months after the City entered into it, and that no services had been provided under the terms of the contract. As a result, the Cleveland Police Department commenced a criminal investigation into the Center's job-training contract with MBM.

Nolan testified that as a result of these discoveries, the Mayor's chief of staff met with him, Withers, Defendant Kenneth Silliman, another executive assistant to the Mayor, Defendant Christopher Warren, the City's Director of Development, and Lessie Milton, chief counsel for the City, to discuss the appearance that "JTPA regulations had been violated in the way the payments were made" and that "there was reasonable cause to believe that Mr. Torres had violated the policy of conflict of interest of his own department, the written policy." (J.A. at 183.)

Plaintiff was then asked by Nolan to attend a meeting in the Mayor's office with then Mayor Michael White, the Mayor's chief of staff, Nolan, Silliman and Withers, Warren, and Milton at 6:00 p.m. on December 4, 1998. According to Nolan, "the purpose of the meeting was for the chief counsel of the law department to brief the Mayor on the issues related to the public records requests regarding MBM Trucking and RCR Construction Company." (J.A. at 148–49.) According to Plaintiff, Nolan told him at the meeting that "we're uncomfortable with RCR Construction and your relationship," that "we're uncomfortable with the payments made to MBM Equipment," and that "there is sufficient information ... that there will be a police investigation launched on you." (J.A. at 278.) In the course of the meeting, Plaintiff was informed that he was immediately suspended without pay, and ordered to surrender all City property in his possession. Plaintiff was also advised not to talk to any employees of the Human Resources Division, the City, or any affiliate of the City. Plaintiff also testified that Mayor Michael White interjected by saying: "[L]et me give you a piece of advice, from one long-term employee to another one, do not talk to anybody. You're forbidden from doing so because it will get worse." (J.A. at 279.) Plaintiff was then asked to leave the room, escorted by Nolan to his office in another building where Nolan watched as Plaintiff cleaned out his desk. (J.A. at 279–280.) In a document signed on January 5, 1999, Nolan stated that Plaintiff's suspension was caused by "the City's discovery that a contract was awarded by Mr. Torres to his brother-in-law contrary to city policy." (J.A. at 159, 564–65.)

Although Plaintiff was notified at the meeting in the Mayor's office on December 4, 1998 that he was suspended without pay, no formal notice was sent to Plaintiff until after Nolan received a letter from Plaintiff's attorney shortly thereafter inquiring about this matter. In the meantime, on December 7, 1998, the City issued a press

release about Plaintiff's suspension, which prompted several newspaper articles and television reports about Plaintiff in connection with the misuse of governmental funds.

On December 14, 1998, Plaintiff received a pre-disciplinary hearing in accordance with the City's Civil Service rules. Two days later, on December 16, 1998, Plaintiff received a formal notice from Nolan of his suspension and the charges against him in a letter dated December 11, 1998. Thereafter, in another letter dated December 16, 1998, Plaintiff was informed that he was being suspended for his violation of Civil Service Commission Rule 9.10, arising from various infractions of his duties pertaining to the contracts issued to MBM and RCR. Plaintiff appealed his suspension to the Civil Service Commission by a letter dated December 18, 1998, with a hearing scheduled for February 4, 1999. Plaintiff also filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on January 22, 1999.

A subsequent investigation of Plaintiff conducted by the Cleveland Police Department lasted about "four or five days," and eventually concluded with no charges being filed against Plaintiff. In February or March of 1999, Plaintiff was informed that the police investigation was finalized, and that the results had been submitted to the county prosecutor.

The Civil Service hearings regarding Plaintiff's suspension commenced on February 16, 1999, continued on February 18, 24 and 25, 1999, and were concluded on March 3, 1999. Following the hearings, Referee Janet Beck found:

> Based upon the evidence it is clear that Miguel Torres knew that his brother-in-law, Ray River[a]'s company RCR bid on a City contract for remodeling the East 55th Street Job training center. He knew RCR's bid was the lowest bid.

He knew he did not have authority to enter into a contract. Only the director Joseph Nolan had that power. He did not indicate to Nolan that RCR was his brother-in-law's company. Torres, with the recommendation of his staff, forwarded RCR $18,700 for this contract. RCR performed the contract and was paid by the City. Torres and Ray Rivera are not related by blood and never resided in the same household. Therefore, there is no per se violation of the Ohio Ethics Code or the Charter Section 195 of Cleveland. There was no allegation or proof that Torres derived a benefit from the contract.

(J.A. at 523–24.)

As for the payment of $81,000 by the City to MBM, Referee Beck made the following findings:

> It is apparent that there was a great deal of fraudulent documentation submitted by the contractor or its agents with requests for payment. It is undisputed that the Department of Personnel and Human Resources took over the administration of Enterprise Zone job training and job placement contracts in 1998. Yet, from April until November, 1998, there was no one with the specific assignment of monitoring those contracts despite several key employees being aware of this gap in the oversight of these federally granted funds. Ken Silliman, Joseph Nolan, and Miguel Torres all testified that this was a problem.

(J.A. at 525.) Referee Beck further noted:

> Nonetheless, by his own testimony, Torres admitted discrepancies in the MBM documentation of performance were brought to his attention by his staff in June, 1998, causing him to authorize only a partial payment of $45,000 and to ask the staff to obtain further assur-

ances of performance before final payment.

This was an insufficient level of response. There is no evidence that Torres brought these concerns to Director Nolan before signing the vouchers and forwarding them to the Director for signature. Torres stated there were further assurances sought and obtained prior to the final payment to MBM was authorized, but there is no conclusive evidence of satisfactory documentation in City's Exhibit E, the correspondence file with MBM.

(J.A. at 526–626A). As a result, Referee Beck concluded that Plaintiff was "negligent in performance," but that "no facts were shown that prove deliberate malfeasance." On this basis, Referee Beck recommended that Plaintiff "be suspended for a period of ninety (90) days without pay for the charges set forth in the indefinite suspension letter of December 16, 1998." (J.A. at 526A).

Nevertheless, in a letter on March 9, 1999 signed by Defendant Jeffrey K. Patterson, the new Director of the City's Department of Personnel and Human Resources, Plaintiff was informed that he was suspended pending discharge. In addition to the previous charges, Patterson outlined new charges against Plaintiff to support his proposed dismissal:

It is my conclusion that you have violated the following sections of the Cleveland Civil Service Rule 9.10.

1. Neglect of duty.

3. Incompetency or inefficiency in performance of duties.

5. Conduct unbecoming an employee in the public service.

7. Disorderly, immoral, or unethical conduct while on duty.

15. Negligent, improper or inefficient handling or accounting for public funds or accounts, or violation of any departmental rule or regulation respecting the handling or accounting for public funds or accounts.

18. [O]ther failure of good behavior which is detrimental to the service, or * * * any other act of misfeasance, malfeasance or nonfeasance ion [sic] office.

It is my further conclusion that as a result of these findings, the essence of your employment relationship with the City of Cleveland has been damaged beyond repair. Accordingly, you are hereby suspended pending discharge, effective immediately. You have the right to appeal this decision by filing a notice of appeal in writing with the City of Cleveland Civil Service Commission within ten (10) working days from the date of this letter. Your failure to do so will result in these charges standing uncontested.

(J.A. at 562–63.)

Plaintiff filed a timely appeal of Patterson's dismissal charges with the Civil Service Commission on March 15, 1999. On March 24, 1999, Referee Beck formally submitted her findings of fact and recommendation that the City reinstate Plaintiff and impose a 90 day suspension. On March 31, 1999, Director Patterson adopted some of the referee's findings, but rejected her recommendation that the City reinstate Plaintiff after the suspension, reaffirming his decision to suspend Plaintiff pending discharge.

Thereafter, in May of 1999, Plaintiff was examined at the Cleveland Clinic Emergency Room, complaining of neck and shoulder pains and headaches. He sought follow-up treatment with Dr. Scott Bea at the Cleveland Clinic Internal Medicine Division. Dr. Bea testified that Plaintiff suffered from "major depressive disorder" and "psychological factors affecting [his]

physical condition." (J.A. at 245.) Plaintiff also saw a Dr. Chughtai at the Cleveland Clinic Psychiatric Division, who prescribed four different medications to treat his symptoms. According to Plaintiff, the investigation caused him "significant emotional distress:

> I was under investigation. I would turn on the TV, and I'm the guy in the little picture behind the anchorman on the news, and this is the guy who got axed and heads are rolling in City Hall, and my picture's there. Wake up in the morning and go outside on the porch and pick up the paper, and I'm on the front page, not once, not twice, three or four, five times. When is this going to stop? ...

(J.A. at 286.)

Civil Service hearings on Plaintiff's discharge were held on July 13, 1999 and August 25, 27, and 31, 1999. Plaintiff did not appear at the last two hearing dates on August 25 and 26, 1999, and did not present any witnesses or testify on his own behalf at these proceedings. Following the hearings, Referee Corinne Katz Moore concluded that the City afforded Plaintiff adequate due process, that the City complied with its Civil Service rules and met its burden for discharging Plaintiff for just cause, finding that "[Plaintiff] did not perform his duties in accordance with the City's expectations." (J.A. at 552.) Specifically, Referee Moore found that Plaintiff's discharge was warranted because of his "failure to disclose that his brother-in-law was the owner of RCR," which "is a serious infraction of the City's policies of full disclosure and the Division's Code of Ethics." (J.A. at 552.) The referee also found that Plaintiff "improperly authorized the payments made to MBM for a contract for services that were never performed." (J.A. at 553.) The referee further found that Plaintiff "improperly ordered his subordinates to inflate the number of participants in the JTPA and EZ programs in reports" and "submitted the erroneous figures to the Administration for inclusion in the People's Budget." (J.A. at 553.) In addition, Plaintiff was found to have used improper procurement procedures and to have "permitted several agencies of the City to perform services without a written contract." (J.A. at 554.) The referee also found that Plaintiff "failed to fill critical vacancies within the Division," even though he "was responsible for ensuring that the Division had adequate staffing levels to monitor the contracts and perform its other functions." (J.A. at 554.) On the basis of these findings, Referee Moore sustained Plaintiff's discharge.

Previously, Plaintiff had filed a retaliation charge with the EEOC on April 23, 1999. Right-to-sue letters on both charges were issued on August 27, 1999.

On November 24, 1999, Plaintiff filed his lawsuit against the City of Cleveland, and Michael R. White, Joseph S. Nolan, Barry A. Withers, Jeffrey K. Patterson, Christopher Warren and Kenneth Silliman in their official and individual capacities. Plaintiff's complaint set forth nine causes of action: (1) denial of due process rights; (2) discrimination on the basis of race, color and national origin; (3) discrimination in terms and conditions of employment; (4) retaliation; (5) wrongful discharge; (6) intentional infliction of emotional distress; (7) slander, libel and defamation; (8) abuse of power; and (9) breach of the terms and conditions of employment. Plaintiff sought compensatory and punitive damages, as well as reinstatement to his position as a manager in the Human Resources Division of the City's Department of Personnel.

The jury trial commenced on July 19, 2000 and concluded on August 3, 2000. After the completion of Defendants' case-

in-chief and before the jury was charged, Defendants renewed their motion for a directed verdict. The district court granted Defendants' motion for a directed verdict as to Count I regarding the denial of due process rights and the violation of Plaintiff's First Amendment right of freedom of association; Count VII regarding slander, libel and defamation; and Count VIII concerning abuse of power.

The jury returned a verdict in favor of Defendants on Plaintiff's second cause of action alleging discrimination on the basis of race, color and national origin and his fourth cause of action alleging retaliation. The jury, however, found for Plaintiff on his three state-law claims: Count V alleging an action for wrongful discharge; Count VI claiming intentional infliction of emotional distress; and Count IX for breach of the terms and conditions of his employment contract. Pursuant to the jury verdict, the district court entered a judgment in favor of Plaintiff in the amount of $50,000 on his wrongful discharge claim; $5,500 on his breach of employment contract claim; and $25,000 against the City of Cleveland on his intentional infliction of emotional distress claim. The district court also entered a judgment in favor of all Defendants as to Plaintiff's Title VII discrimination and retaliation claims and a judgment in favor of all Defendants, except the City, as to his claim of intentional infliction of emotional distress.

Pursuant to F.R. Civ. P. 54(c), Plaintiff moved on August 14, 2000 for an order compelling the City to reinstate him to his former position. Plaintiff also moved for a new trial on the same date. On August 16, 2000, Plaintiff filed a motion under Rule 59 of the Federal Rules of Civil Procedure, seeking a judgment on his discrimination and retaliation claims. In addition, the City filed a motion for a judgment as a matter of law under Rule 50 of the Federal

Rules of Civil Procedure. In a memorandum of opinion and order entered on October 2, 2000, the district court denied all the post-judgment motions.

On October 20, 2000, Plaintiff filed a motion to dismiss Defendants' cross-appeal. In an order entered on December 1, 2000, this Court denied Plaintiff's request to dismiss Defendants' cross-appeal.

## DISCUSSION

### Plaintiff's Appeal

#### I.

On appeal, Plaintiff maintains that the district court erred in directing a verdict as to his § 1983 claims. Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the non-moving party. *Moore v. KUKA Welding Sys.* 171 F.3d 1073, 1078 (6th Cir.1999); *Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1023 (6th Cir.1993).

Plaintiff first claims that the district court erred in directing a verdict on his due process claim because he presented substantial evidence in his case-in-chief to show that he was suspended from his Civil Service protected position on December 4, 1998 without notice and contrary to the City's Civil Service Commission Rules. Here, Plaintiff has cited no legal authority to support his position, and thus his due process claim should be deemed waived for appellate review. *Figueroa–Rubio v. INS,* 108 F.3d 110, 112 (6th Cir.1997).

■ At any rate, we note that Plaintiff has failed to show that the district court erred in directing a verdict on his due process claim. At trial, the record established that Plaintiff was a Civil Service employee subject to the Civil Service rules for the City, including Rule 9.20. As De-

fendants point out, a pre-disciplinary hearing is not required under Rule 9.20(B) of the Civil Service Commission Rules. Rule 9.20(B) provides:

> When in the opinion of a superior, the conduct of the officer or employee is such as to require that he/she be relieved of duty immediately, such officer or employee may be relieved from duty by oral order, provided that such officer or employee be notified of the reason(s) for the superior's actions as soon as possible and promptly afforded an opportunity to respond to the charge(s) against him/her. In all such instances, such opportunity shall be provided the officer or employee within three (3) working days after being relieved from duty.

(J.A. at 368.) Here, it was within the discretion of Defendant Nolan, then Personnel Director, to remove Plaintiff immediately from duty on December 4, 1998 without a pre-disciplinary hearing. In this instance, Plaintiff was notified of the reasons for his suspension during the course of the meeting in the Mayor's office on December 4, 1998. Although Plaintiff did not receive Nolan's December 11, 1998 letter formally informing him of the charges until December 16, 1998, he received a pre-disciplinary hearing two days previously on December 14, 1998. Thereafter, Plaintiff had a hearing before Referee Beck.

Although Rule 9.20(B) specifies that notice of the charges should be provided within three days after a employee has been relieved of duty, Plaintiff was not formally apprised in writing of the charges until seven days had elapsed. Notwithstanding, the record makes it abundantly clear that Plaintiff was given notice and an opportunity to be heard, notwithstanding the technical violation of Rule 9.20. In directing a verdict on the due process claim, the district court thus properly found:

> [P]laintiff was] given adequate notice and a reasonable opportunity to be heard. He was given notice on December the 11th. He received a letter, and he was told what the charges were. He was then permitted a hearing before Referee Beck made a finding. Thereafter, Mr. Patterson sent him a letter outlining new charges and setting up a new hearing before the Civil Service Referee.

Accordingly, the district court did not err in directing a verdict on Plaintiff's due process claim.

■ The district court also did not err in directing a verdict on Plaintiff's abuse of power claim. In Count VIII, Plaintiff claims that the City abused its police power by investigating him for misuse of governmental funds. In directing a verdict on this claim, the district court stated:

> I make the finding that a police investigation was appropriate under the circumstances. Police investigated and talked to his employees, who said that he visited daily with the owner of the trucking company. He signed the voucher that caused payment to be made, $81,000 for work not done. The fact is that he also, his department— through his department, a contract was let to his brother-in-law, and he failed under the regulations to indicate that his brother-in-law was given this contract.
>
> Under the circumstances, the investigation, police investigation of the Plaintiff was a total of five days. They subpoenaed his bank records and found that there was nothing amiss. They dropped the investigation [into Plaintiff]. The investigation continued for a year, and at the end, appropriately, all findings were turned over to the County Prosecutor, who directed the findings to a

County Grand Jury, which returned an indictment as against the owner of the trucking company.

We note that other than Plaintiff's bare allegations, there is no evidence supporting his claim that the investigation was improper. As Defendants point out, MBM Trucking was the focus of the alleged misuse of governmental funds, not Plaintiff. Although the police examined Plaintiff's banking records, there was no evidence of any impropriety on the part of the police. Further, contrary to Plaintiff's assertion, there was also no competent evidence introduced at trial that the police had Plaintiff under surveillance.[1] Moreover, Plaintiff has cited no legal authority to support his position, and thus his claim should be deemed waived for appellate review. *Figueroa–Rubio*, 108 F.3d at 112. Thus, the district court properly dismissed Count VIII alleging abuse of power.

The district court also did not err in directing a verdict on Plaintiff's First Amendment claim, alleging a violation of his right to association and free speech. In directing a verdict on this claim, the district court stated:

At to the First Amendment claim, the City has a compelling government[al] interest in its smooth and efficient operation because the Plaintiff was the manager of his division. It would have been extremely disruptive for him to be making contact while an investigation was going on with any persons. The City had a perfect right to protect against abuse of the investigation. Preventing the Plaintiff from discussing his suspension with other employees was the least restrictive means to further the interest, the compelling interest of the City.

Because Plaintiff has again cited no legal authority to support his position, this claim should be deemed waived for appellate review. *Id.*

■ Finally, the district court did not err in directing a verdict on Plaintiff's state-law claim alleging libel and slander. In this regard, Plaintiff alleged in his complaint that Defendants acted unlawfully in issuing a "press release announcing Plaintiff's discharge and making public the unsubstantiated allegations against Plaintiff." (J.A. at 16.) The district court dismissed Plaintiff's state-law claims of libel and slander, finding that the articles about Plaintiff were truthful:

Torres was a manager of his department, Torres signed a voucher that caused payment to be made to a contractor, payment was made for work not done, all true. Torres managed a department which let a contract to his brother-in-law. He admitted himself that he never disclosed this fact to anybody and indicated that he didn't think he had to. This is true. An investigation was commenced, and this is true.

On appeal, Plaintiff claims that the district court erred in finding that he signed a voucher that caused payment to be made to a contractor because there were others who actually approved the payment and in finding that he managed a department that "let a contract to his brother-in-law." Here, Plaintiff cannot sustain a claim for libel under Ohio law. To establish a claim for libel, a plaintiff must prove (1) a false statement, (2) that is defamatory towards the plaintiff, (3) the statement must be in writing, (4) the statement must be published, and (5) the defendant must be proven guilty of some degree of fault. *See Black v. Cleveland Police Dept.*, 96 Ohio App.3d

---

1. As the trial record reveals, the district court sustained the objection to Town's testimony that Plaintiff stated to him that the police were following him as part of an investigation. (*See* J.A. at 210–11.)

84, 644 N.E.2d 682, 684 (1994). In this case, the press release issued by the City consisted of true statements regarding Plaintiff's discharge and the police investigation into the matter. Accordingly, the district court properly dismissed this claim.

## II.

■ Next, Plaintiff contends that the district court erred in instructing the jury on his discrimination and retaliation claims. This Court reviews the district court's jury instructions *de novo*. *See Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 966 (6th Cir.1998). Jury instructions are to be reviewed as a whole rather than piecemeal, in order to determine "'whether they adequately inform the jury of the relevant considerations and provide a basis in law for abiding the jury in reaching its decision.'" *Hostetler v. Consolidated Rail Corp.*, 123 F.3d 387, 393 (6th Cir.1997) (quoting *O–So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 502 (6th Cir.1992)). "A judgment may be reversed if the instructions viewed as a whole, were confusing, misleading and prejudicial." *Hostetler*, 123 F.3d at 393; *see also Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 828 (6th Cir.2000). However, this Court will not reverse a decision on the basis of an erroneous jury instruction where the error is harmless. *See United States v. Toney*, 161 F.3d 404, 412–13 (6th Cir.1998).

In this case, Plaintiff contends that the district court's jury instructions on intent misled the jury into believing that discriminatory or retaliatory intent had to be Defendants' sole motivation in discharging him. There is no merit to this claim.

As for the discrimination claim, the district court, over Plaintiff's objection, instructed the jury as follows:

In order for Plaintiff to recover on this claim, the Plaintiff must prove that the Defendants intentionally discriminated against him, that is, his race, color, or national origin must be proven to have been a motivating factor in the decision to discharge Plaintiff ... To show purposeful discrimination, Plaintiff must establish by a preponderance of the evidence that the Defendants intended to discriminate against Hispanic–Americans and that this intent to discriminate was *a motiving factor* in the Defendants' decisions concerning the Plaintiff.

(J.A. at 336.) (emphasis provided). As for Plaintiff's retaliation claim, the district court gave a similar instruction, stating that the fact that the plaintiff had filed a previous complaint for discrimination or retaliation was a motivating factor in the defendants' decision to suspend and terminate the Plaintiff. In denying Plaintiff's motion for a new trial on the basis of instructional error, the district court correctly pointed out:

[T]he instructions unambiguously state that the improper intent must have been "*a* motivating factor" in the Defendants' conduct. No reasonable juror could interpret these instructions as requiring that the improper intent be the sole reason for the Defendants' conduct.

*See Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir.2000) (noting that a plaintiff's race need only be a motivating factor in adverse employment action, not necessarily the sole factor, for the plaintiff to succeed in Fourteenth Amendment equal protection claim based on allegations of race discrimination in employment).

## III.

■ There is also no merit to Plaintiff's claim that the district court denied him the opportunity to present evidence to support his disparate treatment claim. This Court

reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Gessa,* 971 F.2d 1257, 1260 (6th Cir.1992).

At trial, the district court allowed Plaintiff to present evidence to support his disparate treatment claim. Specifically, the district court, over Defendants' objection, allowed Plaintiff to present the testimony of Mr. Wayne Town, a white male, regarding the circumstances of his suspension from his city position pending the outcome of a criminal charge. Nonetheless, Plaintiff claimed in his motion for a new trial that the district court did not permit him to introduce such evidence in support of his disparate treatment claim. In denying his motion for a new trial on this basis, the district court properly rejected Plaintiff's contention as follows:

> The Plaintiff's discovery request can only be characterized as an oppressive "fishing expedition" seeking broad evidence relating to various employment decisions. He made no showing that the evidence sought would elicit treatment of similarly situated individuals. More specifically, there was no showing that Wayne Town was similarly situated. The only similarity was that he, like the Plaintiff, was a project manager. There were no other significant similarities. For example, there was no evidence that Town ever signed vouchers to pay for work not performed, nor that he did not disclose that the City let contracts to his relatives. As to similarly situated individuals, the Court permitted testimony. For example, the Plaintiff elicited testimony that the three other individuals who signed the MBM vouchers were not disciplined. It was reasonable for the jury to conclude that this difference in treatment was insufficient to show discriminatory or retaliatory intent.

Here, it is apparent that the district court gave Plaintiff the opportunity to present evidence that he was treated differently than others so as to support his discrimination and retaliation claims. As Defendants point out, the jury, as the trier of fact, thus had the opportunity to weigh Town's testimony in determining whether Plaintiff suffered disparate treatment. Accordingly, there is no basis to Plaintiff's claim that the district court erred in denying him an opportunity to present evidence to support his claim of disparate treatment.

## IV.

Plaintiff next argues that the district court abused its discretion in admitting the findings of Civil Service Commission Referees Beck and Moore because they were "categorically irrelevant" under Fed.R.Evid. 402, and that even if their findings were relevant, they should have been excluded under Fed.R.Evid. 403 because their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. While the basis of the district court's evidentiary ruling is not entirely clear from the available record, it appears that the district court allowed the findings of Civil Service Commission Referees Beck and Moore into the record because counsel for Plaintiff sought to call both referees as witnesses. In ruling on Plaintiff's request to introduce the testimony of Referee Beck, the district court stated: "She can just tell us what her finding was. I'm not going to have her go into all the testimony that was exacted at the time of the hearing." (J.A. at 307.) At trial, Plaintiff called both referees as witnesses.

Although Plaintiff claims that the findings of Civil Service Commission Referees Beck and Moore were irrelevant because the referees made rulings on alleged work-

place violations under Civil Service rules, and not the issues raised in his complaint, the evidence in question was nonetheless relevant to this case, particularly on the issue of whether the City had just cause to dismiss Plaintiff. *See* Fed.R.Evid. 402 (noting that "relevant evidence" is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). Further, the probative value of the evidence in question was not substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury under Fed. R.Evid. 403. *United States v. Layne*, 192 F.3d 556, 573 (6th Cir.1999). Accordingly, the district court did not abuse its discretion by admitting into evidence the findings of Civil Service Commission Referees Beck and Moore.

### V.

██ Plaintiff also claims that he was entitled to reinstatement to his former position because he prevailed on his wrongful discharge claim. Because Plaintiff has cited no legal authority to support his position, his claim should be deemed waived for appellate review. *Figueroa–Rubio*, 108 F.3d at 112. In any event, we find that the district court did not abuse its discretion in denying Plaintiff's request for an order of reinstatement to his former position. *See Hudson v. Reno*, 130 F.3d 1193, 1198 (6th Cir.1997). As the district court noted in denying Plaintiff's claim in his motion for a new trial:

> Plaintiff's benefits at his current job are comparable to those he had with the City. Compensation for benefits, therefore, does not justify reinstatement. In addition, the Plaintiff had the full opportunity to present evidence of damages, including front pay. On the face of the

verdict, the jury rejected this evidence, presumably as too speculative to justify an award. The jury's decision was reasonable in light of the evidence, and ordering reinstatement as a means to award front pay would usurp the jury's role in weighing the evidence on damages. There is no basis for doing so.

> In addition, equitable principles do not justify reinstatement. It has been nearly two years since the Plaintiff worked for the City. The evidence revealed ill will exists between the parties. An order of reinstatement, therefore, would create an unworkable situation, and likely jeopardize important programs at the One Stop Career Center to the detriment of the Cleveland residents who rely on those programs.

In light of the reasons adduced by the district court, we cannot conclude that it abused its discretion in rejecting Plaintiff's request for reinstatement.

### *Defendants' Cross–Appeal*

#### I.

On cross-appeal, Defendants first argue that the jury ignored the substantial weight of the evidence in finding for Plaintiff on his claim of wrongful discharge.

This Court reviews *de novo* the district court's ruling on a motion for a judgment as a matter of law under Federal Rule of Civil Procedure 50. *See Conte v. General Housewares Corp.*, 215 F.3d 628, 635 (6th Cir.2000) (citing *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996)). Purely legal questions are also reviewed *de novo* by this Court. *Id.* (citing *Hostetler*, 123 F.3d at 390). In determining whether the evidence is sufficient to support a jury's verdict on state-law claims, this Court applies state law standards. *Id.* As we noted in *Conte*, "this court, like the district court, construes the evidence most strongly in favor of the non-

movant; if there is substantial evidence supporting the jury verdict, about which reasonable minds may disagree, the motion is properly denied." *Conte*, 215 F.3d at 635–36. "Under Ohio law, the credibility of the witnesses and the weight of the evidence are not to be considered when ruling on such a motion." *Id.* at 636 (citing *Cardinal v. Family Foot Care Ctrs., Inc.*, 40 Ohio App.3d 181, 532 N.E.2d 162, 164 (1987)). "Substantial evidence" is defined to mean more than a mere scintilla. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Crouch v. Secretary of Health & Human Servs.*, 909 F.2d 852, 855 (6th Cir.1990).

■ In this case, the district court did not err in finding that the jury's award of $50,000 to Plaintiff on his wrongful discharge claim was not against the substantial evidence. As a Civil Service employee, Plaintiff could be discharged only for just cause as set forth in Ohio Revised Code 124.34.[2] As Defendants point out, "just cause" was defined in the jury instructions as "a default in an employee's performance of his duty, the natural tendency of which is to injure the employer, even if it does not result in an actual injury to the employer." (J.A. at 475.) In their motion for a judgment as a matter of law, Defendants claimed that there was no evidence that the City lacked just cause to discharge Plaintiff, citing an extensive record indicating that Plaintiff was discharged because he violated Civil Service Rules 9.00 *et seq.*

by failing to disclose a family relationship with a contractor, by failing to monitor and evaluate properly contracts under his supervision and by approving payments for a contract that had not yet been completed. However, in denying Defendant City's motion for a judgment as a matter of law on Plaintiff's wrongful discharge claim, the district court found:

> [T]here was evidence by which a reasonable juror could conclude that the City lacked just cause. The criminal investigation as to the Plaintiff was brief and found no criminal wrongdoing. He was suspended with pay [sic], however, before the investigation was complete. Furthermore, the others who signed the MBM voucher were not disciplined. Indeed, Mr. Vasquez apparently received a raise and/or promotion the day the Plaintiff was suspended. In addition, the alleged "full disclosure" policy, despite its apparent importance, was not a written policy. This reasonably could have led the jury to question whether the Plaintiff's conduct with respect to the RCR contract warranted discharge. Based on this evidence, a reasonable jury could have concluded that the Plaintiff was unfairly singled out, discharged too hastily, or discharged for reasons other than his performance.

In addition, after the first Civil Service hearing, which was based primarily on the MBM and RCR matters, the referee recommended suspension rather

---

**2.** O.R.C. § 124.34 provides in pertinent part:
.  (A) The tenure of every officer or employee in the classified service of the state and the counties, civil service townships, cities, city health districts, general health districts, and city school districts of the state, holding a position under this chapter, shall be during good behavior and efficient service. No such officer or employee shall be reduced in pay or position, fined, suspended, or removed, except as provided in section

124.32 of the Revised Code, and for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of this chapter or the rules of the director of administrative services or the commission, any other failure of good behavior, any other acts of misfeasance, malfeasance, or nonfeasance in office, or conviction of a felony . . .

than discharge. Furthermore, the evidence as to the charges considered at the second Civil Service hearing was not as extensive as it was regarding the MBM and RCR matters. Therefore, a reasonable jury could have concluded that discharge was an excessive punishment under these circumstances.

The district court also noted in a footnote that the jury's verdict finding in favor of Plaintiff's wrongful discharge claim, but rejecting his Title VII claims involving discrimination and retaliation, were mutually consistent since the jury could have found that the City lacked just cause to discharge Plaintiff without finding that discrimination or retaliation was a motivating factor.

On appeal, Defendants argue that although Plaintiff was in the classified Civil Service, just cause for his dismissal was established by the City as confirmed by Referee Janet Beck in her findings that the City had just cause to act against him. Thus, Defendants claim that they overcame Plaintiff's initial proffer of a prima facie case of wrongful discharge, shifting the burden of proof to Plaintiff to overcome the City's evidence of misfeasance and nonfeasance.

Nevertheless, viewing the evidence most strongly in favor of Plaintiff, we conclude that the district court did not err in denying Defendants' motion because there was substantial evidence supporting the jury verdict. *Conte,* 215 F.3d at 635–36. On this matter, the jury was not bound by the findings of the Civil Service Commission referees and was free to draw its own conclusions from the evidence presented whether just cause existed for Plaintiff's discharge. Although Defendants insist that the evidence overwhelmingly supported their claim that Plaintiff was discharged for just cause and that the City suffered actual injury to the reputation of its Empowerment Zone training programs, the district court properly found that it was not unreasonable for the jury to conclude that discharge was excessive under the circumstances of this case. While it was undisputed that the City paid MBM Trucking on a fraudulent invoice, it appeared that no single official was responsible for monitoring the contracts issued by the Empowerment Zone One–Stop Career Center. Further, Plaintiff was not the official legally responsible for the payment of the invoice submitted by MBM. As the record indicates, Director Nolan and Commissioner Goodwin were the only officials authorized by law to approve the payment. Thus, the jury could have concluded that Plaintiff was simply the "fall guy" for a bureaucratic lapse in the administration of the contracts issued by the Center. In addition, the jury could have surmised that the City overreacted by discharging Plaintiff's on the basis of the RCR contract. As the district court noted, there was a question whether Plaintiff violated the so-called "full disclosure" policy since there was a question about whether it was a written policy. Moreover, we note that it was a committee that approved the RCR contract, not Plaintiff acting on his own. Finally, in view of the fact that the Referee Beck recommended that Plaintiff be reinstated after his suspension, the jury could have concluded that his discharge, as recommended by Personnel Director Patterson, who succeeded Director Nolan, and affirmed by Referee Moore, was unwarranted. As the district court noted, the evidence presented at the second Civil Service hearing did not deal with the MBM and RCR contracts. Thus, a reasonable jury could have concluded that the City's termination of Plaintiff's employment was unwarranted.

## II.

■ However, we agree with Defendants that the district court erred in find-

ing that the jury's award of $5,500 to Plaintiff on his breach of employment contract claim was not against the substantial evidence. In denying Defendant City of Cleveland's motion for a judgment as a matter of law on Plaintiff's breach of employment contract claim, the district court stated:

> On the claim for breach of employment contract, the jury awarded the Plaintiff damages approximating compensation for the amount of vacation accrued but not taken at the time of his suspension without pay. The Defendant argues that there was no employment contract, relying on the employment manual which provides that nothing therein should be construed as creating a contract. However, the jury reasonably could have found that the parties had a meeting of the minds specifically with respect to the payment of unused vacation pay. Thus, even assuming there was no contract creating an entitlement to his employment generally, it was within the jury's province to enforce promises made with respect to vacation pay.

Although Plaintiff claims that the City of Cleveland breached his employment contract because he could not be discharged absent "just cause" and that as a civil servant he had guaranteed rights, such as the right to collect sick leave and vacation pay, he has failed to identify any legal basis for this claim. As Defendants point out, a public employee's position in Ohio is governed by statute. *Fuldauer v. Cleveland*, 32 Ohio St.2d 114, 290 N.E.2d 546 (1972). Further, Defendants claim that the introduction to the City's Personnel Policies and Procedures Manual, which was entered into evidence as Plaintiff Exhibit 12, states in bold type:

**NOTHING IN THIS MANUAL SHOULD BE OR IS TO BE CONSTRUED IN ANY WAY, SHAPE OR FORM AS TO CREATE OR CONSTITUTE AN EMPLOYMENT CONTRACT OR A CONTRACT OF ANY NATURE WHATSOEVER OR A GUARANTEE OF OR CONTINUING EMPLOYMENT.**

Defendants' Br. at 13. In any case, Plaintiff has failed to identify any contract between the City and himself.

Notwithstanding the absence of a contract, the jury could have awarded $5,500 to Plaintiff on his breach of employment contract claim if there was sufficient evidence that the parties had a "meeting of the minds" with respect to the payment of unused vacation pay. However, on the present record before this Court, there does not appear to be any evidence indicating the existence of any "meeting of the minds" regarding Plaintiff's unused vacation pay. As Defendants point out, any failure by the City to pay Plaintiff's vacation time cannot be construed to create a "meeting of the minds" to form an employment contract. Because there does not appear to be any legal basis for Plaintiff's breach of employment contract claim, we must conclude that the district court erred in finding that the jury's award of $5,500 to Plaintiff on his breach of employment contract claim was not against the substantial evidence.

## III.

■ Finally, the district court erred in finding that the jury's award of $25,000 to Plaintiff on his intentional infliction of emotional distress claim was not against the substantial evidence.

To establish a claim of intentional infliction of emotional distress under Ohio law, a plaintiff must show: (1) the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to plaintiff; (2) the actor's conduct was so extreme as to go beyond all

possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Garcia v. ANR Freight System*, 942 F.Supp. 351, 359 (N.D.Ohio 1996) (citing *Tschantz v. Ferguson*, 97 Ohio App.3d 693, 702, 647 N.E.2d 507 (1994)); *Koenig v. City of Dayton*, 28 Ohio App.3d 70, 74, 502 N.E.2d 233 (1985); *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 375, 453 N.E.2d 666 (1983); *Pyle v. Pyle*, 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (1983).

The Supreme Court of Ohio stated the applicable standard in *Yeager*:

The standard we adopt in our recognition of the tort of intentional infliction of serious emotional distress is succinctly spelled out in the Restatement as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement of the Law 2d, Torts (1965) 71, Section 46(1).

This approach discards the requirement that intentionally inflicted emotional distress be "parasitic" to an already recognized tort cause of action as in *Bartow [v. Smith*, 149 Ohio St. 301, 78 N.E.2d 735 (1948) ]. It also rejects any requirement that the emotional distress manifest itself in the form of some physical injury. This approach is in accord with the well-reasoned analysis of a substantial number of jurisdictions throughout the nation. *See* Prosser, supra, at 59, footnote 20.

With respect to the requirement that the conduct alleged be "extreme and outrageous," we find comment d to Section 46 of the Restatement, supra, at 73, to be instructive in describing this standard:

" * * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. *See Magruder*, Mental and Emotional Disturbance in the Law of Torts, [49] Harvard Law Review 1033, 1053 (1936). * * * "

*Yeager*, 453 N.E.2d at 671.

According to Plaintiff, he suffered "significant emotional distress" after losing

his employment, being subject to a police investigation and having to contest the charges against him. As a result of the stress, Plaintiff developed stomach pains, a sore neck, headaches, and painful shoulders and sought treatment at the Cleveland Clinic Foundation. Further, Dr. Bea testified that Plaintiff suffered from "major depressive disorder" and "psychological factors affecting [his] physical condition." (J.A. at 245.) In light of this evidence, the jury awarded Plaintiff $25,000 on his intentional infliction of emotional distress claim.

In denying the City's motion for a judgment as a matter of law on Plaintiff's intentional infliction of emotional distress claim, the district court stated:

> It was the jury's responsibility to determine the credibility of witnesses. Based on the Plaintiff's testimony, if believed by the jury, reasonable jurors could find that the City treated him with excessive hostility in the manner by which he was suspended and discharged. The conduct, therefore, was extreme and outrageous. His testimony was supported by a psychologist, who testified as to the Plaintiff's emotional distress. The Defendant argues that the psychologist was not seen until months after the events in question, and that he testified that the distress could have been caused by the Plaintiff's own feelings of guilt regarding his performance. Although there was evidence on both sides as to the cause of the Plaintiff's distress, it was the jury's job to weigh the evidence. It reasonably determined on the totality of the evidence that the City's actions satisfied the elements of the Plaintiff's claim. In addition, the amount of damages awarded was reasonable as measured against the evidence regarding the City's conduct.

However, contrary to the district court's ruling, there is nothing in the record to demonstrate that the City of Cleveland intended to cause Plaintiff serious emotional distress as defined under the *Yeager* standard. Here, the City suspended Plaintiff because its officials believed that he had violated City policies; there was no substantial evidence that the City intended to cause Plaintiff serious emotional distress. Further, no reasonable juror could find that the City's actions regarding Plaintiff in this case were "extreme" and "outrageous," and "utterly intolerable in a civilized community." *Yeager*, 453 N.E.2d at 671. Moreover, even assuming the existence of proximate cause, Plaintiff cannot show the fourth element—that he suffered serious mental anguish. Although the emotional distress alleged does not have to "manifest itself in the form of some physical injury," *Yeager*, 453 N.E.2d at 671, it must be "serious." The Ohio Supreme Court has described "serious emotional distress" as "emotional injury which is both severe and debilitating ... [it is] found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983). In this case, Plaintiff has not demonstrated "debilitating emotional injury." The record reveals that Plaintiff, complaining of a sore neck, headache and shoulder pain caused by stress, saw a psychologist for an initial evaluation and one follow-up visit. After Plaintiff was terminated by the City, he started at a new job. There is nothing in the record to indicate that Plaintiff continued to suffer such infirmities. Under the facts of this case, no reasonable jury could conclude that Plaintiff suffered serious mental anguish.

Accordingly, Plaintiff's emotional distress claim must fail because there was not

substantial evidence that the City intended to cause Plaintiff serious emotional distress, because none of the City's actions could be construed as constituting extreme or outrageous conduct that is "utterly intolerable in a civilized community," and because no reasonable jury could have concluded that Plaintiff suffered serious mental anguish.

## CONCLUSION

Accordingly, we **AFFIRM** the district court's award of $50,000 to Plaintiff on his wrongful discharge claim, **REVERSE** the awards of $5,500 on his breach of employment contract claim and $25,000 on his intentional infliction of emotional distress claim, and **REMAND** the case for further proceedings in the district court consistent with this opinion.